## SUCCESSION OF NORA.

The stat. of 15 March, 1830, s. 1, merely makes lawful certain sales of the property of successions made by auctioneers. It does not purport to interfere with the power of courts to direct such property to be sold by their officers. Under the new organization of the judiciary and of the office of sheriff, by the constitution of 1845, such sales should be made by the sheriff.

APPLICATION for a mandamus to the judge of the Second District Court of New Orleans. The testamentary executor of the widow *Nora* represented that, with the consent of the heirs of age and by the advice of a family meeting on behalf of the minors, he had, in his capacity of executor, applied for the sale of the immovable property of the succession, to be made by one *Tricou*, a licensed auctioneer of the city of New Orleans: That the judge refused to comply with the petitioner's demand, that the sale should be made by the auctioneer named by him, thus refusing to the petitioner the exercise of a right granted to him by a particular statute, that of having the property administered upon by him sold by a licensed auctioneer: That this refusal is a denial of justice which can only be remedied by a mandamus, and that the property in question exceeds the sum of $300. He prayed for a mandamus to the judge of the court below, commanding him to comply with the demand of the petitioner.

In answer to a rule to show cause why a peremptory mandamus should not be issued, *Canon*, J., alleged: That the sale prayed for had been ordered to be made on the 25th of January, 1847, under the provision of the Code of Practice, arts. 760, 767: That it is provided by the Code of Practice, art. 1046, that the sales of property belonging to successions shall be made, in New Orleans, by the register of wills, under the direction of the judge: That by the 1st sec. of the stat. of 15 March, 1830, it was declared that the sales of such property might be made by auctioneers, " provided that the executor, &c. cause the *procès-verbal* of such sales when made in the parish of Orleans, to be recorded in the office of the register of wills, and when made in any other parish of this State in the office of the judge ;" that since the re-organization of the the judiciary system, and the suppression of the office of register of wills, the right to employ an auctioneer to make such sales must be considered as done away with, since the *procès-verbal* of the sales can no longer be recorded in the office of the register of wills.

*Le Gardeur*, for the petitioner. A mandamus is the only means by which the plaintiff can obtain redress. The judge alleges that he has ordered the sale prayed for, to be made by a competent officer. But that officer is not the one we have designated, as we had a right to do, and the order given is not the order prayed for. This order is not final but interlocutory, being rendered on mat-

ters incidental to the settlement of the estate; and such judgments are not appealable from, unless they produce an irreparable injury.   In this case, not only is there no irreparable grievance, but there is not even a grievance so far as the succession is concerned, as it will certainly not be contended that the parties interested can by any means be aggrieved, or injured, simply because the sale would be made by the sheriff. Indeed the only party aggrieved is the executor, who is denied the exercise of a right which is secured to him by law; but as the succession is neither aggrieved nor injured, the consequence is plain that the executor had no right, for the redress of his individual wrongs, to appeal from that judgment, had it been appealable from.   The Code of Practice, art. 831, provides that a mandamus may issue at the discretion of the judge, even when a party has other means of relief, if *the slowness of ordinary legal forms* is likely to produce such a delay, that the public good and the administration of justice will suffer from it.

It is not contended that the sheriff had no right to sell succession property. But can this *general* authority destroy the right vested in executors by a *special* law of the land?   In other words, can a *special* law be repealed by implication?   This is the only question before the court.   Until 1830, the probate judges in the country and the register of wills in New Orleans were the only persons authorised by law to make sales of the property.   Code of Practice, art. 924, no. 5, and art. 1046.   In 1830, the legislature passed an act, the first section of which provides " that it shall be lawful for testamentary executors, administrators and curators to cause the property, real and personal; of such succession or successions as may be under their administration, to be sold by any commissioned auctioneer, and such sale or sales, so made, shall be good and valid in law."   So that, previous to the abolition of the parish and probate court system, the law with regard to the sale of succession property stood thus: The power to sell was vested in the probate judges in the country and the register of wills in New Orleans, and this was the general rule on the subject; but under the 1st section of the statute of 1830, executors, administrators and curators, had a right to cause the property under their administration to be sold by any commissioned auctioneer; and this was the exception to the general rule.   How does the law stand on this subject now?   The sheriff, if the reasoning of the lower court be correct, and we have no interest or disposition to question its soundness, is the officer who has superseded the register of wills, so far as the sales of succession property are concerned.   The power to sell such property would then vest in him, under the general rule of law.   But as no change has taken place in our system of laws relative to the settlement of successions, although the ministerial officers, through whose agency it was carried into effect may have been changed, the consequence is that the exception in the 1st section of the act of 1830, which existed before the adoption of the new constitution, and was a limitation of and a restriction upon the general powers of the register of wills, still continues to exist as an exception to the general rule, under which, in the opinion of the lower court, the sheriff is now authorized to make the sales in question.   Registers of wills are no longer known to our laws; but the duty was imposed on auctioneers to file a *procès-verbal* of the sales made by them in the register's office, because the latter was the clerk of the probate court; and this formality can easily be complied with now, by recording the *procès-verbal* in the clerk's office of the court which orders the sale. Besides, the new constitution, art. 142, provides that " all laws in force at the time of the adoption of this constitution, and not inconsistent therewith, shall continue as if the same had not been adopted ;" and the statute of 1830 is certainly not inconsistent with the constitution which vests no new powers in sheriffs, but simply provides (art. 83) that " a sheriff shall be elected in each parish by the voters theof, for the term of two years."

If it be correct that no express repeal of the act of 1830 can be found; that there is no contrariety between the general power to sell succession property as claimed for the sheriff by the lower court, and the special power vested to the same effect in auctineers by the statute of 1830; and lastly, that the statute under consideration is not inconsistent with the new constitution, the conclusion must be that the statute is still in force, unless abrogated by considerations of a general character.   And this brings us to the only question before the court, that is, whether a special law can be repealed by implication.

Zachariæ, " Cours de Droit Civil Français," vol. 1, p. 31, § 29, says: " Toute fois, l'abrogation tacite ne peut résulter que d'une contrariété formelle ; dan

le doute, il faut, en la rejetant, interprêter la loi nouvelle de manière à la met- SUCCESSION
tre en harmonie avec la loi antérieure. *Posteriores leges ad priores pertinent,* OF
*nisi contrariæ sint.* *D'un autre côté, une loi spéciale n'est pas tacitement abro-* NORA.
*gée par une loi générale postérieure. Lex specialis per generalem non abroga-*
*tur.*" Pothier, in his Pandects, title *De Legibus,* sect. 1, art. 5, no. 25, speaks
thus : " Cum duæ leges contrariæ videntur, quarum altera specialiter de casu
de quo judicandum aut respondendum est, disponit, altera generaliter duntaxat
disponit, prævalere debet illa quæ specialiter disponit." Merlin, in his " Ré-
pertoire de Jurisprudence, Vo. Loi, § 11, art. 3, says : " Les lois spéciales
sont-elles abrogées de plein droit par les lois générales pestérieures ? Non."
The Court of Cassation, in a decision dated August 8th, 1822, (Journal du Pa-
lais 17, page 561,) held that " en principe, les lois et règlemens relatifs à des
matières spéciales ne peuvent être considérés comme abrogés par des lois géné-
rales postérieures, qu'*autant que celles-ci contiennent des dispositions formelles*
*et expresses d'abrogation.*" The same learned tribunal, in another decision of
July 13th, 1826, held the same doctrine, but in a different language. They
said: Les lois générales ne dérogent point tacitement aux lois speciales, qui,
*par leur nature même,* conservent leur effet tant qu'elles ne sont pas *spécialement*
*abrogées.*" Journal du Palais, 20, p. 688.

Sir Wm. Blackstone, in his celebrated Commentaries on the laws of Eng-
land. at page 89, of vol. 1st, says:

" Where the *common law* and a *statute* differ, the common law gives place to
the statute, and an old statute gives place to a new one. And this, upon a gen-
eral principle of universal law, that "*leges posteriores priores contrarias abro-*
*gant;*" consonant to which it was laid down by a law of the twelve tables at
Rome, that "*quod populus postremum jussit, id jus ratum esto.*" *But this is to*
*be understood when the latter statute is couched in negative terms, or where its mat-*
*ter is so clearly repugnant, that it necessarily implies a negative.* But if both acts
*be merely affirmative,* and *the substance such that both may stand together,* here
the latter does not repeal the former, *but they shall both have a concurrent effica-*
*cy.* If by a former law an offence be indictable *at the quarter sessions,* and a lat-
ter law makes the same offence indictable at the *assizes,* here *the jurisdiction of*
*the sessions is not taken away,* but both have a concurrent jurisdiction, and the
offender may be prosecuted at either, unless the new statute subjoins *express*
*negative words,* as that the offence shall be indictable at the assizes, *and not*
*elsewhere.*"

In the case of *De Armas,* (10 Mart. p. 172,) the Supreme Court adopted the
principles recognized by the authorities above quoted, and held: " That a par-
ticular law is not repealed by a subsequent general law, unless there be such re-
pugnancy between them, that they cannot be complied with under any circum-
stances." But nowhere is this principle more clearly and forcibly illustrated,
than in the recent case of the *Bank of Louisiana* v. *Farrar and wife.* 1 Ann.
Rep. 49. *Mrs. Farrar* had bound herself jointly and in solido with her husband,
in favor of the bank, under the 32d section of the charter granted to that institu-
tion in 1824. When sued upon that joint obligation, she resisted the claim, on
the ground that the 32d section of the charter was repealed by art. 2412 of the
Louisiana Code, which prohibits a wife from binding herself for her husband.
But your honors thought differently ; and his honor, the chief justice, who deli-
vered the opinion of the court on that occasion, said : " In Louisiana, special laws
form a large portion of our legislation. It is one of the evils of the times. An
effort was made in the late convention, to place some restraint on what was felt to
be an abuse in legislation ; but it failed, and special legislation is a part of our sys-
tem. We cannot hold this section to be repealed *by what we consider an impli-*
*cation.* For the exception of the 32d section is no more in contradiction with
art. 2412, than it was to the laws in reference to which it was passed; the relation it
bears to each, is to all intents and purposes, identical. It was an exception to the
former law ; it remains an exception to this."

The case of the *Bank of Louisiana* v. *Farrar and wife,* is alone decisive of
this. In that case, the wife resisted the plaintiff's demand, on the ground
that the special law of 1824, was repealed by the general law of 1825. But the
court thought differently, and decided that the exception in the special law of
1824 was no more in contradiction with the general law of 1825, than it was
with the law in reference to which it was passed; that it was an exception to

the former law, and remained an exception to the latter. In this case, the execu-tor claims the exercise of a right vested in him by a special law of 1830; and that right is denied to him by the learned judge of the Second District Court, be-cause, in 1845, the office of register of wills was abolished, whence he concludes that the sheriff has the right to sell succession property, under the general powers of his office.   But it will be decided, in accordance with the principles laid down in the case of *Farrar*, that the exception in the special law of 1830 is no more in contradiction with the laws of 1845, than it was with the laws in refer-ence to which it was passed; that it was an exception to the former laws, and remains an exception to the latter.

Grymes, contrâ.   The plaintiff in his anxiety to prove that he has no other remedy but that of *mandamus*, has succeeded in showing most clearly, that he is not entitled to that writ.   He admits in his argument that there is not only no "irreparable grievance," but no grievance at all, "so far as the succession is concerned; as it will certainly not be contended that the parties interested can by any means be aggrieved or injured, simply because the sale would be made by the sheriff: indeed, the only party aggrieved is the *executor*, who is denied the exercise of a right secured to him by law," etc.   From this we see clearly the issue tendered by the petitioner, and the true grounds of his com-plaint, and what he calls a denial of justice.

It appears by the answer of the honorable judge of the Second District Court, that the order for the sale prayed for by the plaintiff, was actually grant-ed on the 25th of January, 1847.   The return of the judge is not traversed, nor its truth denied; it must, therefore, be taken as true.   It is distinctly admitted that the succession, and those interested in it, are in no manner aggrieved or injured by the nature and tenor of the judge's order; and that the plaintiff, in his representative character of executor, in which capacity the whole proceed-ings in the cause were conducted, has sustained no injury.   The whole cause of complaint is, that the plaintiff has not been permitted to exercise his arbitra-ry caprice in the choice of an agent to execute a judicial judgment or decree, in opposition to judicial discretion, fairly and clearly exercised.   The object of the struggle is to deprive the court of all discretion in the choice of the officer who is to execute its mandates and judgments, and to vest it in the arbitrary will of an irresponsible suitor, one acting (as in this case) not in his own right, but in a fiduciary capacity, under the sanction and by the appointment of that very court, immediately amenable to it, and considered in law as administering in all respects under its supervision and control.

From these facts, and others appearing in this case, we submit, in support of the cause shown by the judge of the Second District Court, the following pro-positions:

1. In the language of Lord Bacon, that "a mandamus is a writ commanding the execution of an act where otherwise *justice would be obstructed*, or the king's charter neglected, issuing regularly only in cases *relating* to the *public* and the *government*; and is therefore termed a prerogative writ." 4 Bacon, page 498—verbo *Mandamus*.   And, in the language of the Code of Practice, that "the object of this order (mandamus) is to prevent a denial of justice, or the consequence of a defective police," and should be issued where the law has assigned no relief by the ordinary means, and where justice and reason re-quire that some mode should exist of redressing a wrong or an abuse.

2. That no obstruction of justice has taken place, the order prayed for hav-ing been granted.   That no injury has resulted either to the thing, nor the per-sons interested in the thing over which the court exercised jurisdiction in the course of the proceedings complained of, and no injury or damage caused to the immediate party in his representative or fiduciary character, in which ca-pacity alone he was before the court; nor any actual damage or loss to him in his individual capacity.

3. That the exercise of a sound discretion by the court, is a power and a right inherent in all courts, unless forbidden by positive law, and more especially in courts of probate, which are invested by law with the supervision over the ad-ministration of estates in the hands of trustees, such as executors, administra-tors, tutors etc. etc.; and that the exercise of such discretion involves nothing in relation to the public and the government, in the true sense of the authors quoted, and is nothing more than ordinry judicial action upon matters coming before the courts, in the exercise of their acknowledged jurisdiction.

4. That there is nothing in this case in relation to defective police. There is no wrong to redress; for it is expressly admitted that the parties interested have suffered none. There is no abuse to correct; for the privilege contended for by the plaintiff is a bare naked right, uncoupled with any perceivable interest—not granted to him by any statute, positive in its terms, passed upon any considerations of a public nature, but subject to judicial interpretation and judicial discretion.

5. That the statute of 1830, quoted by the plaintiff, (Bullard and Curry's Digest, p. 2,) is directory only in its terms: it creates and vests no positive and absolute rights in the persons named in the statute, independent of all judical interpretation, discretion, or control: it does not, in direct terms, exclude judicial action; and this can never be done by implication—by the general terms of the law: it cannot be conclusively inferred that it relates to the sales of property to be made by the judgment or order of the court. In its terms it would seem to relate to the extra-judicial action of the executor, curator, etc. To suppose that a statute contemplated judicial action as necessary to the accomplishment of an act—that it should be done by virtue of a judgment or decree of a court, and at the same time deprive that court of all power or discretion as to the organ or means by which its judgement should be executed, and vest that power in a party to the suit, would be to suppose a case that might be within the scope of legislative power; but it is a conclusion which no court should arrive at by implication. It would render the court the mere organ of the party to the proceedings—invest him with an arbitrary authority, to be exercised ex parte, and without opposition, destructive of the legitimate power and authority of the court, and tending to disorder, fraud and numberless abuses. When the powers of the judiciary are necessarily called into action, for the accomplishment of any lawful purpose, they are necessarily seized of the whole subject—have a right to act upon it in all its parts—to look to the execution, as well as the rendition of their judgments, unless restrained by some clear, positive, and prohibitory law. No such law is to be found in the statute quoted and relied on by the petitioner. If the court had any discretion in the matter, then a mandamus will not be granted (*Louisiana College v. The State Treasurer*, 2 La. 394); nor is a mandamus in this case at all necessary to aid this court in its appellate jurisdiction, as contemplated by the Code of Practice, art. 838.

6. The privilege claimed by the plaintiff has no appreciable value; it could not come before this court, nor be considered by it, in the exercise of its appellate jurisdiction. It has no permanent, fixed, or useful existence. It may be used capriciously, or it may not be used at all, and, if not claimed or used, the matter would belong to the court, which is the strongest argument to prove that the court is not wholly without power or discretion in the matter. For all these reasons we believe that this is not a case for a mandamus.

Supposing all these objections to the remedy by mandamus to be overruled, and the court in possession of the cause, what judgment should be rendered?

1. The probate system and all its machinery, as it existed prior to the adoption of the new constitution, has been abolished, or modified by the new constitution, to such an extent as to repeal or render inapplicable many of the statutes passed in relation thereto. In relation to the particular statute relied on by the plaintiff, the first section declares that the sales to be made by auctioneers shall be good and valid in law, upon an express *proviso*: that the *procès-verbal* of such sales shall be recorded in the office of the register of wills, when made in the parish of Orleans, and in the office of the parish judge, when made in any other parish. The office of register of wills in the parish of Orleans is abolished, and so are the parish judges throughout the State; and, neither the constitution, nor any law passed under it, has endowed any other office or officer with all the faculties or functions exercised by either the register of wills or parish judges; yet the proviso of the statute is clear that such sales shall only be *valid in law* upon that condition.

But suppose it should be considered that by necessary implication those duties and functions have been transferred to some other officer, and that a recording in some other office would satisfy the exigency of the law. What office is this to be? Surely it would be for the judiciary to decide this, upon a fair and legal interpretation of the constitution and laws; and travel round the whole circle of this case, and we must come back to this point of judicial interpretation. In the present state of the law there is no escaping from it; it must begin in the inferior court, for this court has no original jurisdiction. The cor-

SUCCESSION
OF
NORA.

rectness of the judgment of a court of the first instance, pronounced on matters of law arising in the course of judicial proceedings, and submitted to its decision, connot be inquired into on a mandamus; and if the powers of this court, in the exercise of its ordinary appellate jurisdiction, will not reach the case; if the thing claimed has no value, or none but an imaginary one which will not support the jurisdiction of this court, it only proves that it is a case in which the constitution has not provided the means of revising such judgments.

By this statute it is made the duty of the executor, curator, &c. &c., or *some one else*, to cause the *procès-verbal* of sales to be recorded. Suppose the executor or curator fail to do it? Suppose no person else takes the trouble to do it? The statute makes it a condition precedent to the validity of the sales, that the recording should take place. Judges of the District Court cannot be expected to devote their time to watching the conduct of suitors, of executors, curators, &c., or to the performance of any extra judicial functions; this is forbidden by the constitution. If the law invoked by the petitioner be in force, and gives him what he contends for, the absolute right, independent of all judicial power or action, to the exercise of this privilege, the validity of all sales of this nature must depend upon the conduct and will of executors, administrators, curators, &c. and great confusion, frauds and litigation must be the natural consequence. Such a state of things must be sufficient to open the door and let in the judiciary to act upon the subject, and its judgments must be considered as judgments in the discharge of their ordinary judicial functions, and to be revised and corrected in the ordinary manner, and where this cannot be done, to remain final, as in other cases.

2. We take it for granted, that the sheriff, by virtue of his office, is the proper person to execute all orders, judgments, decrees and mandates of the several courts of justice of this State. That this is the peculiar, appropriate, universal and necessary attribute of his office, independent of any special statute or law so declaring it. That a judgment, order, or decree of a district court, directing or ordering a sale of property, is, in every sense of the word, a judicial act or judgment, done or rendered by such court; and that the execution of such a judgment or decree would fall directly within the legal and natural attributes and functions of the sheriff's office. That all special legislation, by which any part or portion of the duties, powers or rights of the sheriff are transferred to any one else, is an exception to the general rule; and, if the person to whom any such powers, rights and duties are transferred be an officer of the State, it is to all intents and purposes a transfer of the duties and powers of one office under the State, to be held and *exercised* by another. The 126th article of the constitution of the State declares, that "no person shall hold or exercise at the same time more than one civil office of emolument." The act of 1830, authorizing auctioneers to execute the judgments of the courts, is in conflict with this article of the constitution, and, of course, repealed by it. Auctioneers are officers of the State—they are appointed by the governor, by and with the advice and consent of the senate—and commissioned as such, and their duties are regulated by law; they are the collectors of a considerable portion of the revenue of the State; and it is not competent to the legislature to get round the true meaning of the constitution, by cutting up and parceling out the legitimate and lawful powers, duties, and attributss of one office, and accumulating and adding them to another; and thus doing indirectly, that which it would be unconstitutional to do directly. No court of justice would be justified in sanctioning such a course, under the actual legislation on the subject; nor will this court, by mandamus, compel a district judge to act as in the case of an acknowledged, valuable, indisputable and useful right, in a case where the construction of the constitution and the statutes of the State are called in question, and where his judicial discretion is necessarily called into action.

3. The judge of the Second District Court returns, that the order for the sale, as prayed for by the plaintiff, has been granted; but, that he has ordered it to be made by the sheriff of the parish of Orleans. In this he has exercised a sound legal discretion, upon every principle of public order, safety and convenience. To execute the judgments and decrees of the courts of justice, is the natural and almost exclusive duty of the sheriff, as laid down and regulated by law. He acts under an oath of office, and a heavy official security. His office is in immediate contact with all the courts of justice, and he is under their easy and constant superintendence; and, as an officer of the courts, he is subject to their authority by summary process. All the records, documents and proceedings in

relation to the business of the courts; are kept together in one office, and of easy access to the public. Being an independent public officer, and his duties regulated and prescribed by law, and the most summary remedies provided to restrain him within the bounds of his duty, and to punish him when he exceeds them, the public business is more safe in his hands; and his fees or compensation being fixed and regulated by law, all temptation to bargains and collusions with executors, administrators or curators, for a share in commissions and emoluments is done away with. He is elected by the people of the parish and is amenable to them; and in addition to all the other checks and securities created by positive law, the slightest violation of duty is subject to the action of public opinion through the ballot box, at short periods. The struggle on the part of the petitioner in this case is for the exercise of an arbitrary privilege or will, that has no intrinsic value to him in the fair and honest exercise of his functions as executor. Its only object is to enable him to distribute his patronage, and the emoluments arising from sales of this nature among the auctioneers of the city, at his pleasure. This is a dangerous power with which to invest individuals, who are parties to judicial proceedings—who are mere trustees, guardians, or administrators of property for others. It is dangerous to the public to entrust the execution of judicial decrees or judgments to many persons who are not under the immediate cantrol of the courts, who act under no official responsibility, and who owe their employment and its emoluments to the patronage or choice of one party to a suit or judicial proceeding. As to the emoluments arising from business of this nature, if they must accrue, it is certainly better that they should go to the sheriff than to any one else. His office is essentially a public one—he is not supposed to be engaged in any private business, trade or calling—it is wholly for the public—it is a very expensive one, and the profits or emoluments are divided among a host of deputies, clerks and employés, whom he is obliged to maintain for the public service, whether the emoluments of his office be great or small, and being thus distributed contribute to the support of a large number of persons and famlies who are in need of such employments. Auctioneers, on the contrary, are not only officers of the State, but they are also private merchants, traders and dealers—the whole trade and commerce of the country is open to them, they are subject to all its vicissitudes, from the accumulation of large fortunes to bankruptcy. They employ no more clerks or persons than are necessary for their private business; they contribute to the emolument or living of no one beyond the exigencies of their own interests.

They are appointed by the governor, and in proportion as you add to their functions and emoluments, and introduce them into the administration of justice, you add to executive patronage and power, and take away from the people that power and authority over public officers, and weaken their accountability to them, which it is clearly the object of our new constitution to create and establish upon an effectual and lasting basis.

The auctioneer, not being an officer of the courts of justice, but owing his employment to the good will of a party litigant, is beyond the reach of the summary process and proceedings of the court; in many cases he could only be reached by the ordinary and tardy process of the law. He is without the restraint of an approaching popular election and accountability to the people; he may trust to explanations, and appeals to executive clemency, mercy or favor, for a re-appointment; when appointed by partnerships and associations in commerce, he may be the mere holder of a sinecure commission, and all the public business placed in his hands be entrusted to the management and control of persons not elected by the people—not even appointed by the executive—but private merchants and traders, wholly irresponsible to the public, and in whose appointment and induction into the most important public concerns, the public has never been consulted, directly or indirectly; or he may bring his commission as so much capital into the partnership, thus trafficing in executive patronage, and advancing his private fortune at the hazard of the public good.

From all these considerations it is submitted that the judge of the Second District Court has exercised a sound, legal and just discretion in this matter, and that the mandamus asked for should be refused.

The judgment of the court was pronounced by

EUSTIS, C. J. The executor of the last will of the widow *Nora* applied to the Second District Court of New Orleans, for the sale of the property of the

SUCCESSION OF NORA.

succession, and prayed that the sale might be made by an auctioneer designated in his petition. The judge considering that the sale ought to be made by the responsible officer of the court, who is bound by law to execute all its orders, directed it to be made by the sheriff. The executor has applied to us for a *mandamus* which was granted *nisi*, and on the return we have the reasons for the action of the district judge, which are conclusive. This is no case for a mandamus. The law of 1830 merely makes lawful certain sales made by auctioneers. It does not even purport to interfere with the power of courts to direct the property of successions to be sold by their officers, who, for grave reasons, courts may consider ought to be entrusted with them, and still less to take away that power. Under the new organization of the judiciary, and of the office of sheriff, by the constitution of 1845, the district judge was certainly right in directing the sheriff to make the sale of the property of the succession.[*]

The application for a mandamus is dismissed, with costs.

---

[*]See stat. of 10th March, 1847, ch. 79, relative to judicial sales, and the supplementary act, as it is termed, of 7 April of the same year, ch. 96.